UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| In re Allison M. Benthal,<br><br>                    Debtor.<br>------------------------------------------------<br>Patrick S. Layng, United States Trustee<br><br>                    Plaintiff,<br>v.<br><br>Allison M. Benthal,<br><br>                    Defendant – Debtor. | Bankruptcy No.  10-B-73169<br>Adversary No. 10-A-96191<br>Chapter 7<br>Judge Manuel Barbosa |

## MEMORANDUM OPINION

This matter comes before the Court on the United States Trustee's Amended Complaint

Objecting to the Debtor's Discharge under 11 U.S.C. §727(a)(4) and (a)(6). For the reasons set forth

herein, the Court shall enter judgment in favor of the Plaintiff and the Debtor shall be denied a

discharge under 11 U.S.C. §727(a)(4).

## JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal

Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

## FACTS AND BACKGROUND

The following facts and procedural history are taken from the Amended Complaint and

Answer thereto, from the docket and pleadings filed in the underlying bankruptcy case, of which the

Court has taken judicial notice, and from the testimony and exhibits presented at the trial held on September 18, 2012.

Dr. Benthal is a Doctor of Osteopathy, having received a medical degree from Michigan State University in 1989, and has been practicing medicine since 1990. She operated her own medical practice, Allison Benthal, D.O., from 2004 until March 31, 2010. The practice was operated through a service corporation until the corporation was dissolved in December 2009 for nonpayment. The corporation owed Associated Bank $18,200 as of the petition date on a loan secured by substantially all the assets of the special corporation and was personally guaranteed by Dr. Benthal.

After her medical practice faltered in early 2010, Dr. Benthal sought new employment. On April 26, 2010, Dr. Benthal signed an employment agreement accepting a position as a permanent physician with Beloit Health System, Inc. ("Beloit Health") in Wisconsin with a minimum guaranteed annual base salary of $195,000. She could not begin immediately, however, because she first had to obtain a Wisconsin license. However, Beloit Health gave her a $15,000 salary advance on May 11, 2010, and Dr. Benthal signed a promissory note in favor of Beloit Health for this amount on the same day. The promissory note stated that her employment starting date would be in July 2010, that the note would be repaid over a six-month period by payroll deductions, and that if she failed to commence employment with Belioit Health the advance would become immediately due and payable. On June 23, 2010, Dr. Benthal informed Beliot Health that she would be taking a new job in Southern Illinois instead, by hand-delivering a note to their office. Her Wisconsin license was ultimately issued in July 2010, but she claims that she did not actually receive it until August 2010.

On June 11, 2010, Dr. Benthal signed an employment agreement with a placement service,

Medical Doctor Associates, providing for placement to work at the Country View Medical Center

(a/k/a the Illinois Back Institute) (hereafter "Country View") in Rockford, IL, from June 11, 2010,

to March 31, 2011, for $70 per hour.  The agreement provided that if she accepted permanent

employment with Country View or an affiliate within two years, Medical Doctor Associates would

be entitled to its scheduled finder's fee from Country View.  The agreement further provided that

Dr. Benthal would not agree to such employment within the two year period unless the finder's fee

was paid and that she individually guaranteed payment of the finder's fee.  Dr. Benthal began

working at Country View immediately, initially on a *locum tenens* basis.[1]  She received a paycheck

from Medical Doctor Associates for $1,103.00 on June 21, 2010, and a paycheck for $1,076.00 on

June 24, 2010, for shifts worked on June 16th and June 18th.

Country View almost immediately indicated an interest in hiring Dr. Benthal permanently,

and she signed an employment application to Country View dated June 24, 2010, requesting a salary

of $155,000 per year.  Dr. Benthal argued that she did not enter into a direct and permanent

employment agreement with Country View until August, but the evidence shows that she began

receiving paychecks directly from Country View, rather than from Medical Doctor Associates, at

least as early as June 23, 2010.  Furthermore, her pay stubs from Country View listed her as an

"employee" of Country View at least as early as the pay period 06/19/2010 - 07/02/2010.  Dr.

Benthal testified that Country View was "very concerned that they not have to pay a finder's fee to

the Medical Doctors Associates" (Tr. 130:24-25). If so, Dr. Benthal was complicit in the scheme

despite her obligation to the contrary under the employment agreement with Medical Doctor

---

[1]Locum tenens is defined as "a medical practitioner who temporarily takes the place of another."
Merriam-Webster's Collegiate Dictionary (11th Ed. 2008).

Associates, at least as long as it suited her. She testified that she eventually contacted Medical

Doctor Associates to inform them of what had happened, but only after she was fired by Country

View - in her view unjustly - in January 2011.

On April 16, 2010, Dr. Benthal sold an EKG machine and vaccines from her (then-dissolved)

medical practice to Cherry Valley Medical Clinic for $1,010 and $510, respectively, without the

consent of her secured lender Associated Bank. In March 2011, Associated Bank learned of the

transfer and made demands upon Dr. Benthal. Dr. Benthal was able to buy the EKG machine back

from Cherry Valley for $1,010 in April 2011 and return it to Associated Bank, but not the vaccines.

In May and June 2010, Dr. Benthal received payments from insurance companies of at least $677

relating to services she provided before her practice closed in March 2010.

Dr. Benthal filed for protection with this Court under Chapter 7 of the Bankruptcy Code on

June 24, 2010. She was represented by counsel in preparing her bankruptcy petition and schedules.

She had previously filed a Chapter 7 case and received a discharge in 1999. Her attorney

emphasized to her the importance of being complete and truthful in her petition and schedules.

Although the schedules were prepared and initially reviewed several days before the petition was

filed, Dr. Benthal's attorney spoke with her on the day the petition was filed and confirmed with her

that she was not aware of any necessary changes.

Dr. Benthal failed to disclose numerous assets in Schedule B to her petition, including: (1)

a computer server and computer software, (2) a collection of American Girl dolls, which had cost

over $11,000, (3) two copier machines, (4) an EKG machine, (5) two additional bank accounts, (6)

several puppies she had purchased for approximately $1,900 less than two weeks prior to the petition

date and (7) her right to receive a tax refund for 2008 and 2009 of $17,500. She failed to list

Associated Bank as a secured creditor in Schedule D, and also initially failed to list her debt to Beloit

Health of $15,000 in Schedule F. She also failed to list any real estate leases on Schedule G, though

she did list her landlord ADV Real Estate Investments, LLC, as an unsecured creditor owed $25,000

in rent in her Schedule F.

Dr. Benthal listed herself as unemployed and her estimate of average or projected monthly

income as of the petition date in her initial Schedule I as $0.00. In Question 17 to Schedule I, she

listed that she was not aware of any increase or decrease in income reasonably anticipated to occur

within the following year. In her Statement of Financial Affairs, she listed her gross income from

employment or operation of business in 2010 as $0.00 through the petition date, and listed the

amount as $6,000 for 2009 and $5,000 for 2008. In her Statement of Financial Affairs, she failed

to list a payment of $4,550 to the Saint Peter School and a payment of $2,000 to Biological Health

Care, both within 90 days prepetition - a period during which a bankruptcy trustee may be able to

avoid certain payments as preferential transfers. In her Statement of Financial Affairs, in response

to a question about closed financial accounts, she failed to disclose an account at Associated Bank

that she had closed within a couple months prior to her petition date, as well as a savings account

at Chase Bank that she had closed pre-petition. In her Statement of Financial Affairs she failed to

disclose that within 6 months of her petition she had been a 50% owner of DAMA Holding Corp.,

LLC with her ex-husband. In her Statement of Financial Affairs, she failed to disclose the sale of the

EKG machine and vaccines, as well as sales of jewelry to Clodius & Co. on May 7, 2010, for

$1,030.01, on May 21, 2010, for $74.96, and on May 24, 2010, for $290.00, as transfers outside the

ordinary course of business made within 2 years of the petition. She also testified that she withdrew $4,500 from her checking account within 90 days prior to the petition date "to pay ... multiple lawyers" (Tr. 161:20-22), but only disclosed a single payment of $650 to her bankruptcy lawyer in her Statement of Financial Affairs.

Post-petition, in July 2010, Dr. Benthal received at least $2,122 in payments from insurance companies or patients related to services provided by her prepetition through her medical practice, but failed to disclose to or turn over any of these payments to the Chapter 7 Trustee.

On July 2, 2010, Dr. Benthal's landlord at her petition-date residence, ADV Real Estate Investments, LLC, brought a motion for relief from stay for default on her lease, which was granted on July 7, 2010. She was subsequently evicted and moved to a rental home in Plainfield. She claims that one of the unscheduled copier machines was damaged during this move. She also claims that the American Doll collection was destroyed in a flood at the Plainfield home in January 2011. Had the Chapter 7 Trustee been made aware of these unscheduled assets, such damage or destruction may have been avoided.

On July 26, 2010, Dr. Benthal filed an Amended Schedule F to list the $15,000 debt to Beloit Health. Shortly before her 341 meeting of creditors on August 9, 2010, Dr. Benthal informed her attorney that she had begun working and had a current income but did not have an income when she filed the case (Tr. 24:2-11). Dr. Benthal testified at the 341 Meeting of Creditors that she had begun working post-petition and had an annual income of $140,000 and had moved to a new residence. In response to this new information, the United States Trustee's office requested numerous times after the 341 meeting that Dr. Benthal amend her Schedule I and J. When Dr. Benthal failed or

refused to do so, the United States Trustee eventually brought a motion to compel her to do so, as well as to provide various information, which motion was granted on November 17, 2010. Finally, on January 1, 2011, Dr. Benthal filed an Amended Schedule I, listing that she was unemployed and receiving monthly unemployment of $2,165.[2] An Amended J was never filed, nor did Dr. Benthal ever amend her Statement of Financial Affairs, Schedule B, Schedule D, or Schedule G.

On December 22, 2010, Associated Bank brought a motion for relief from stay to enforce its promissory note against the collateral of the special corporation that, as sole shareholder, had become Dr. Benthal's property upon the dissolution of the corporation in December 2009. The motion for relief was granted on January 3, 2011.

The Chapter 7 Trustee eventually received copies of the 2008 and 2009 tax returns in March 2011, which showed Dr. Benthal had a right to a refund of $17,500. The Chapter 7 Trustee received $5,400 of the funds at that time. After investigating further, the Chapter 7 Trustee learned that Dr. Benthal had endorsed the checks for the remainder of the refund over to her accountant, and one time fiancée, Dayton Smith, and that Mr. Smith was claiming he was owed the money for his services. The Chapter 7 Trustee eventually reached a settlement with Mr. Smith, with Mr. Smith to retain $5,000 for his services and to turn over the remainder to the Chapter 7 Trustee.

## DISCUSSION

The "successful functioning of the Bankruptcy Code hinges both upon the bankrupt's veracity

---

[2]The Court can only presume that Dr. Benthal was listing her income as of January 28, 2011, the date of the amendment, despite the fact that the amended schedule clearly states that the income is an "Estimate of average or projected monthly income at time case filed."

and his willingness to make a full disclosure." Stamat v. Neary, 635 F.3d 974, 983 (7th Cir. 2011). This willingness to provide full and accurate information is part of the cost to obtain a discharge of debts, a "privilege … reserved for the 'honest but unfortunate debtor.'" Id., 635 F.3d at 978. To further this policy, the Bankruptcy Code contains an exception to discharge where "the debtor knowingly and fraudulently, in or in connection with the case … made a false oath or account." 11 U.S.C. §727(a)(4).

To prevail on a claim under Section 727(a)(4), the United States Trustee "must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." Stamat, 635 F.3d at 978. "A debtor's petition, schedules, statement of financial affairs, statements made at a § 341 meeting, testimony given at a Federal Rule of Bankruptcy Procedure 2004 examination, and answers to interrogatories all constitute statements under oath for purposes of § 727(a)(4)." Neary v. Stamat, No. 08-C-6543, 2009 WL 2916834 (N.D. Ill. Sept. 2, 2009), aff'd, 635 F.3d 974. "Where schedules or other materials contain omissions or representations with an intent to mislead creditors as to the debtor's financial condition, the requirements of section 727(a)(4) are satisfied." Id. A "showing of reckless disregard for the truth is sufficient to prove fraudulent intent." Stamat, 635 F.3d at 982. Moreover, "the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent under section 727(a)(4)." Id., 635 F.3d at 982 (internal citation omitted). Mere negligence is insufficient, but the expectations are higher depending on the level of education, business experience and sophistication of the debtor.

Id., 635 F.3d at 982. A plaintiff need not demonstrate that an omission or misrepresentation was actually detrimental to creditors. Instead, a fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." Id., 635 F.3d at 982 (internal citations omitted).

Here, Dr. Benthal admitted that her bankruptcy schedules and Statement of Financial Affairs contained numerous errors and omissions (Tr. 76:10-13). The evidence shows that the cumulative effect of these misstatements demonstrated at least a reckless disregard for the truth. Dr. Benthal was highly educated, had substantial business experience, ran her own medical practice for more than five years, has filed a bankruptcy petition before, and apparently has significant experience with the legal system through her extended divorce proceedings. Moreover, the misstatements and omissions were not technical or ancillary. They went to the very heart of her financial situation and the information necessary for a Chapter 7 Trustee to properly administer an estate. They included tens of thousands of dollars of undisclosed income and assets, and a failure to disclose significant prepetition transfers and payments that were potentially avoidable by the Chapter 7 Trustee. Additionally, valuable assets that were subsequently damaged or destroyed, such as the $11,000 doll collection, could have been protected if the Chapter 7 Trustee had been made aware of them early in the case.

In addition to a reckless disregard for the truth, there was evidence that Dr. Benthal had actual and fraudulent intent to misrepresent her financial condition. Since a debtor will rarely admit fraudulent intent, it must often be inferred from the circumstances. See, e.g., Smith v. Taylor (In re Taylor), 424 B.R. 438, 443 (Bankr. S.D. Ind. 2009). One example of knowing misrepresentation is

that Dr. Benthal testified that she "agonized over ... a couple of days" whether or not to include her

debt to Beloit Health in her bankruptcy schedules before finally deciding to amend her schedule. (Tr.

171:17-25, 172:1-2). She therefore admits that this was a conscious decision. Dr. Benthal tried to

make it sound as though she omitted Beloit Health from her schedules because she wanted to help

her creditor, apparently under the belief that a failure to list the debt would except it from any

discharge. But it is not for a debtor to knowingly provide false information to the Bankruptcy Court

by intentionally omitting a creditor. Moreover, omitting a creditor deprives the creditor of the notice

and due process and protections for creditors in the Bankruptcy Code, and can also deprive them of

the right to share in a distribution of the estate. If a debtor truly wants to repay a creditor for moral

reasons, the debtor can reaffirm the debt, 11 U.S.C. §524(c), or can always choose to voluntarily

repay the debt despite a discharge, 11 U.S.C. §524(f). Failing to list a creditor can therefore only

harm them, not help them. The evidence also showed that Dr. Benthal has a history of making errors

or omissions when it suited her interests. For example, Dr. Benthal helped Country View avoid

paying a finder's fee to Medical Doctor Associates by remaining silent despite a clear contractual

requirement to notify Medical Doctor Associates that she had been hired. She remained silent while

it suited her, and only notified Medical Doctor Associates after Country View angered her. Finally,

Dr. Benthal was not a very credible witness, making it difficult to believe her assertion that none of

her misstatements or omissions were intentional or strategic. Her credibility was particularly

hampered by her tendency to place blame on others rather than accept and take responsibility. This

list included her ex-husband, her accountant, her former employees, her former employer, all of her

attorneys, and the United States Trustee. While it is believable that a few people treated her poorly,

it becomes increasingly difficult to believe the entire world was against her and that she was without blame.

When given an opportunity to explain why her errors and omissions were not intentional, or were at least excusable, she failed to offer any adequate excuse or explanation. Her main argument was that she was under a great deal of stress due to a number of traumatic experiences in her life. Although the Court is sympathetic with respect to such events, if true, it is difficult to understand how stress at the time of preparing or filing her bankruptcy petition could have caused her to completely forget such basic facts as that she was employed, or forget that she owned a medical practice with significant assets, or forget large payments and unusual transactions that had occurred only a few days or weeks before. This was not a matter of simply making a poor estimate of value, or forgetting assets that had been sitting in a basement for years. Second, even if stressful events could explain her initial errors, it does not explain why over two years later she has still made no attempt to correct those errors by filing amended schedules. She has obviously become aware of the misstatements in her schedules by now, as she admitted at trial. Nor is this a matter of a debtor not realizing that they have the ability or duty to file amended schedules to correct prior errors. The United States Trustee presented evidence of numerous communications asking her to correct her schedules, and even brought multiple motions before this Court to compel her to do so. In response, Dr. Benthal only ignored requests, dragged her feet, and ultimately failed to fully comply - filing only one amendment to add a single creditor and one amendment to incorrectly state her income over a year after her petition date.

Dr. Benthal also argued that she did not understand the questions being asked in the

schedules. But again, this is implausible or an insufficient excuse. For example, she argues that she thought the title of Schedule B - "Personal Property" - meant that she only had to schedule property in her home, not from her business. Given Dr. Benthal's education and background, the fact that she had filed a prior bankruptcy case, and the fact that she was represented by counsel, this is utterly implausible. Moreover, it is inconsistent with her actual schedules. For example, she did list several assets from her medical practice, including exam tables, otoscopes and accounts receivables. She also seems to allege that she did not realize that the property was hers individually rather than the corporation's, even though the corporation had been dissolved by the time of the petition. But again, her schedules are inconsistent with this argument. First, she does list some property of the medical practice. Second, if she believed the corporation was still a separate entity, then she should have listed her shares in the corporation as assets and listed their value, but did not. Also, if her only problem was that she did not understand the questions or did not have the information at the time, it does not explain why she still has taken no effort to correct her schedules years later.

Dr. Benthal's arguments that errors or omissions were caused by poor estimates based on insufficient information is also implausible. For example, she argues that her listing of her 2008 and 2009 income as $5,000 and $6,000 was simply a poor estimate. But, this is inconsistent with the fact that she had claimed around the same time as the petition in her employment application to Country View that while running her own practice from 2004 to March 2010 she had a starting wage of "$350,000/yr" and an ending wage of "<$50,000." If her statement in her bankruptcy schedules was a poor estimate, it was therefore strategically poor - under-estimating her income when it suited her but over-estimating her income when it suited her. She also argues that she did not list the tax

refunds because she had not prepared her 2008 and 2009 tax returns, yet. But, while this might be an excuse for a poor estimate of the tax refund due to her, it does not excuse the fact that she omitted to disclose any right to a tax refund at all.

A bankruptcy discharge "is a privilege, not a right." In re Juzwiak, 89 F.3d 424, 427 (7th Cir. 1996). Dr. Benthal has not fulfilled her duty to be forthcoming and provide accurate information to the Court, to the Chapter 7 Trustee or to the U.S. Trustee, or to cooperate with the Trustees to the best of her ability. She is therefore not entitled to receive a Chapter 7 discharge under the circumstances. Judgment shall be entered in favor of the Plaintiff, denying Dr. Benthal a discharge, by separate order.

## CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of the Plaintiff, and will deny the Debtor a discharge under 11 U.S.C. §727(a)(4).[3] The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered giving effect to the determinations reached herein.

DATE: November 14, 2012

_____
The Honorable Manuel Barbosa
United States Bankruptcy Judge

---

[3]The Court, finding that the Debtor is not entitled to discharge under Section 727(a)(4), and the evidence being clearer under such grounds, the parallel count seeking to deny the Debtor a discharge under Section 727(a)(6) for failure to comply with this Court's Order entered November 17, 2010, is rendered moot.